## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JAMES LAWRENCE,

    *Plaintiff,*

    v.

HEARST COMMUNICATIONS,

    *Defendant.*

No. 3:20cv200 (MPS)

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

James Lawrence, proceeding *pro se*, brings this diversity action against Hearst Communications asserting claims of defamation and intentional infliction of emotional distress. He alleges that the defendant libeled him in its online articles about his arrests. ECF No. 1. Hearst filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) on the grounds that (1) the articles were substantially true and protected by the fair report privilege; and (2) the plaintiff's emotional distress claim is derivative of the defamation claim. ECF No. 14. Because Mr. Lawrence submitted evidence that he requested the court consider, see ECF Nos. 17, 18, 20, I notified the parties of my intention to treat the motion as one for summary judgment under Rule 12(d) and provided the parties an opportunity to submit additional relevant evidence and briefing. ECF No. 36. In response, the plaintiff submitted a supplemental brief with exhibits, ECF No. 41. I have carefully reviewed all the parties' briefs and evidentiary submissions. For the reasons that follow, summary judgment is granted in favor of the defendant.

## I.      Factual Background

    A.      2018 Arrest

On March 5, 2018, pursuant to a warrant, the Westport police arrested Mr. Lawrence for breach of peace in the second degree in violation of Conn. Gen. Stat. § 53a-181 in connection with a November 5, 2017 incident at a supermarket.  ECF No. 1 at 1.

The arrest warrant application, authored by Officer Sullivan, states the following: a woman called the Westport police department on November 5, 2017, and reported that while she was shopping at the Fresh Market grocery store, a man had followed her around inside the store, then followed her out to the car and stood in front of her car staring at her.  ECF No. 14-2 at ¶ 2.  After she got into the car, she looked up, and the man was standing right next to her driver's side door.  *Id*.  The application further stated that the woman drove away to get away from the man and called the police.  *Id*.  When the police arrived, the man had gone, but Officer Sullivan learned that the police department had had other similar incidents involving a man named James Lawrence.  *Id*. at ¶ 4.  Officer Sullivan left the store, but he was called back to speak with the store manager when Mr. Lawrence returned.  *Id*. at ¶ 5.

Mr. Lawrence said that he came back to the store to return a $100 bill he had found on the floor when he was walking out of the store.  *Id*. at ¶ 6.  He stated that he walked over to the woman's car to see if the money belonged to her, but when he approached her vehicle, she drove away before he could speak.  *Id*.  Mr. Lawrence denied following the woman around in the store and standing in front of her vehicle.  *Id*. at ¶ 7.  When police asked why he waited so long before turning the money over to the store and why he left the store rather than turning it in right way, Mr. Lawrence became agitated and said that he had done nothing wrong.  *Id*.  Mr. Lawrence told Officer Sullivan that he felt the police were harassing him.  *Id*. at ¶ 10.

Officer Sullivan believed that it was possible that Mr. Lawrence saw the police arrive, went home and obtained the $100 bill, and returned to the store to provide himself with a cover.  *Id*. at

2

¶ 9.  The store manager stated that the plaintiff did not want to give his name or speak to the police and that the manager had to convince him to remain until the police arrived.  *Id.*

Officer Sullivan later checked the department's case history as to Mr. Lawrence and learned that there were "10 case incidents logged from 2002 [until the] present."  *Id.* at ¶ 11.  In all these complaints, Mr. Lawrence was seen following the complainants around a store or coffee shop and then following them out to their cars, where he would either stare at them or get right into their personal space.  *Id.*  In most of the cases, Mr. Lawrence was told that his actions scared the complainants to the point of them calling the police.  *Id.*  According to Officer Sullivan, "[Mr. Lawrence] has even stated himself that he needed to rethink his approach with wom[e]n."  *Id.*  Officer Sullivan learned that there were "a lot of" other incidents with Mr. Lawrence that were not reported to the police.  *Id.*

Mr. Lawrence told Officer Sullivan that he had been arrested in a previous incident in town and was able to have the charges "cleared" because he did not do anything wrong.  *Id.* at ¶ 10.  In checking the file later, Officer Sullivan learned that there was a protective order in effect against Mr. Lawrence.  *Id.*  A criminal history search revealed that Mr. Lawrence did "not have a Connecticut history but that he did have an arrest record in the states of Florida and California."  *Id.* at ¶ 12.  The warrant application further stated that Mr. Lawrence had charges in Florida of "resisting arrest and fleeing/eluding police," and charges in California of "petty theft, theft of personal property, stalking, inflicting corporal injury to a spouse and battery of a spouse."  *Id.*

The complainant in the Fresh Market incident declined to provide a sworn statement for fear that Mr. Lawrence would be able to find out who she was and retaliate against her.  *Id.* at ¶ 13.  Officer Sullivan wrote that he learned that the complainants in "all the 9 other cases" felt similarly.  *Id.*

B.   Online Article 1

On March 12, 2018, Hearst published an article on its online website, Westport News, with

the headline "Westport man allegedly followed woman around."  ECF No. 1 at 3; ECF No. 14-3.

The article ("Article 1") stated:

> A Westport resident was arrested on charges of breach of peace after
> following a woman around a grocery store and then out to her car on Nov. 5, police
> said.
> The victim told officers an unknown man followed her around Fresh Market
> on Post Road East and then outside, where he stood by the door of her car.
>
> Police identified the man as James Lawrence, 52, and issued a warrant for
> his arrest.  On March 5, Lawrence turned himself in to police. He was released after
> posting a $5,000 court-set bond and is scheduled to appear in Norwalk Court [on]
> March 14.[1]

ECF No. 14-3.

Another media outlet, News 12, also published news articles about Mr. Lawrence's arrest.

These stated, in pertinent part, that he was "arrested for stalking several women."[2]  ECF No. 1 at

3.

C.   Online Article 2

On March 23, 2018, Hearst published a second article ("Article 2"), the headline of which

was "Police: Westport man harassed women for years." ECF No. 1 at 2; ECF No. 14-4.  Article 2

stated:

> WESTPORT — Local women haunted for years by a man they say would
> aggressively approach them at local stores and cafes are speaking out after his arrest
> earlier this month.

---

[1] Defendant published three articles.  Mr. Lawrence does not appear to assert that this Article was
defamatory.  Instead, he takes issue with Articles 2 and 3.  ECF No. 1 at 2 (referring to Articles 2
and 3, but not Article 1, as libelous).

[2] Prior to commencing this action, Mr. Lawrence brought suit against Altice, News 12's parent
company, for defamation and emotional distress.  *Lawrence v. Altice,* 3:18cv1927(SRU).  This
case is discussed in greater detail herein.

Westporter Wendy Chambers said after reading reports of the arrest of James Lawrence in the media last week, she wanted to come forward with her story.

Since 2002 Lawrence was logged by Westport police in 10 incidents where women felt harassed by him, but in each case, they felt afraid to pursue charges against him for fear of retaliation, according to court documents.

Lawrence has a record of arrests outside of Connecticut, including resisting arrest and fleeing/eluding police in Florida and, in California, he was charged with petty theft, theft of personal property, stalking, inflicting corporal injury to spouse and battery of a spouse.

Recounting her encounter, Chambers said a man introduced himself to Chambers at Westport Stop and Shop around 7:30 p.m. in January as James Laurentis and gave her a card with his alleged name and a link to an "obscure" website, she told the Westport News.

After leaving the Stop and Shop, Chambers said the man followed her to her car.

"He showed up in front of my car and scared the crap out of me. He said he wanted to go out with me and I said I didn't want to go out with him," Chambers said, adding, "He's a creep."[3]

On Feb. 15 Chambers said she saw the man again at the Westport Stop and Shop in the evening and the following day at the Whole Foods Market in Norwalk around lunchtime. On both occasions, Chambers says she avoided the man.

Around the same time, Chambers said her trainer told her a man tried to pick her up at the Whole Foods Market in Darien. Chambers showed her trainer the LinkedIn photo associated with the business card of the man who followed her at Stop and Shop and the trainer confirmed it was the same man who followed her, Chambers said.

Chambers recognized the man in another photo, one published on the Westport News website on March 12 in conjunction with the arrest report for town resident James Lawrence.

"He's got a different name than on the card he gave me," Chambers concluded.

---

[3] Wendy Chambers previously spoke to News 12 about the encounter. ECF No. 1 at 3. Mr. Lawrence sued Ms. Chambers in Connecticut state court for defamation and intentional and negligent infliction of emotional distress arising from these statements as well as statements she made about him to News 12. The court granted her motion to dismiss pursuant to Connecticut's Anti-SLAPP statute, Conn. Gen. Stat. § 52-196a. *See Lawrence v. Chambers*, No. FSTCV205022942S, 2020 WL 6121712, at *1 (Conn. Super. Ct. Sept. 21, 2020).

Lawrence, 52, was arrested on charges of breach of peace after he allegedly followed a woman around the Fresh Market on Post Road East and then out to her car on Nov. 5, police said.

Police issued an arrest warrant for Lawrence and on March 5 he turned himself in to police and was released after posting a $5,000 court set bond. He is next scheduled to appear in Norwalk Superior Court on May[] 4.

In court documents, Officer James Sullivan, who was charged with investigating the case, writes Lawrence is cited in 10 other incidents logged in the Westport case history from 2002 until present.

"In all of these complaints, Lawrence was seen following the complainants around a store or coffee shop and then following them out to their cars where he would either stare at them or get right into their personal space. In most of these cases, Lawrence was told his actions scared the complainants to the point of them calling the police," Sullivan wrote.

A criminal history search of Lawrence turned up no criminal history in Connecticut, but revealed Lawrence's arrests in Florida and California.

In the Nov. 5 case, the complainant would not provide a sworn statement for fear that Lawrence would find her and retaliate, Sullivan wrote. "I also learned that in all the nine other cases that the complainants all felt the same way. That they all feared for their safety and because of this were reluctant to provide statements," Sullivan wrote.

The number of cases involving Lawrence isn't surprising, Chambers said. After the March 12 article about Lawrence's arrest was published she dropped the article off at the Whole Foods in Norwalk and said all the employees knew him. "A woman who saw me show the article to the manager said he's tried to pick her up twice at Darien Whole Foods," Chambers said.

ECF No. 14-4.

D.     2019 Arrest

On February 6, 2019, Mr. Lawrence again was arrested by the Westport police.  He was

charged with harassment in the second degree in violation of Conn. Gen. Stat. § 53a-183.  ECF

No. 1 at 2; ECF No. 14-5 at 10.

According to the police incident report completed by Westport police officer Mark Grasso, he responded to a call from a tenant in a multi-family dwelling in Westport owned by Mr. Lawrence's parents. ECF No. 14-5. The complainant indicated that Mr. Lawrence had emailed her after she instructed him not to contact her. ECF No. 14-5 at 6. She also indicated that she was "very much aware of Lawrence's proclivity for stalking and harassing women and is concerned for her safety and the safety of other women" who lived in the same building "because James has access to the keys to all of the apartments at that address and has previously entered the dwelling on several occasions." ECF No. 14-5 at 5. The report further states that Officer Grasso contacted the Assistant State's Attorney and discussed "the facts of this case with her and based on James Lawrence's history of following women around and causing them concern, she agreed that the email communication from Lawrence constituted the crime of Harassment in the Second Degree in violation of section 53a-183 of the C.G.S. and would review an arrest warrant affidavit for the same if presented to her." *Id.* Officer Grasso secured an arrest warrant and Mr. Lawrence was arrested on February 6, 2019. ECF No. 14-5 at 12.

E.    <u>Online Article 3</u>

On February 11, 2019, Hearst published a third article ("Article 3"), the headline of which was "Westport man accused of harassing women arrested again." ECF No. 14-6. The article, authored by the same reporter who had written Articles 1 and 2, stated:

> WESTPORT — A local man alleged to have harrassed [sic] women for years at area stores has once again been arrested.
>
> Resident James Lawrence, 53, was arrested on charges of second-degree harassment after a victim told the Westport police on Sept. 18 that she was repeatedly harassed by Lawrence. The victim said she made multiple requests to Lawrence that he stop contacting her, but he continued to contact her through email, police said.

Police submitted a warranted [sic] for Lawrence's arrest, and on Feb. 6 he was taken into custody after an officer spotted him at a local gas station. Lawrence was brought to police headquarters and released after posting a $25,000 bond. He is scheduled to appear in state Superior Court of Norwalk on Feb. 7.

Lawrence was also arrested in March after he allegedly followed a woman around Westport's Fresh Market grocery store and then to her car in November 2017. After Lawrence's arrest report was released in March, several woman [sic] came forward claiming they had experienced similar harassment from Lawrence at local shops.

Since 2002, Lawrence was logged by Westport police in 10 incidents where women felt harassed by him, but in each case, they felt afraid to pursue charges against him for fear of retaliation, according to court documents.

Lawrence has a record of arrests outside of Connecticut, including resisting arrest and fleeing/eluding police in Florida. In California, he was charged with petty theft, theft of personal property, stalking, inflicting corporal injury to spouse and battery of a spouse.

In court documents, officer James Sullivan, who was charged with investigating Lawrence in preparation for his March arrest, detailed the 10 incidents in which women reported Lawrence to the Westport police.

"In all of these complaints, Lawrence was seen following the complainants around a store or coffee shop and then following them out to their cars, where he would either stare at them or get right into their personal space. In most of these cases, Lawrence was told his actions scared the complainants to the point of them calling the police," Sullivan wrote.

In the Fresh Market case, the complainant would not provide a sworn statement for fear that Lawrence would find her and retaliate, Sullivan wrote.

"I also learned that in all the nine other cases that the complainants all felt the same way. That they all feared for their safety and because of this were reluctant to provide statements," he added.

ECF. No. 14-6. Mr. Lawrence contacted Hearst and requested that it remove the articles, but the defendant declined. ECF No. 20-2 at 7. The plaintiff was not convicted of the breach of peace and the harassment charge remains pending. ECF No. 1 at 2.[4]

---

[4] The Court may take judicial notice of state court records. *Blaine v. Burnes*, No. 3:19CV251(MPS), 2019 WL 1596573, at *2 (D. Conn. Apr. 15, 2019). See Case No. S20N-CR19-0147994-S,

## II.     LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted).   In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).   "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).   The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).   If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."   *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## III.     DISCUSSION

### A.     Defamation

Mr. Lawrence alleges that Hearst defamed him in Articles 2 and 3 by using the term "harassed" and stating that he had "harassed women for years." ECF No. 1 at 4.   As to Article 2, Mr. Lawrence asserts that neither the Fresh Market complainant nor the arrest warrant application used the word "harass."   ECF No. 17 at 9.   Regarding Article 3, he argues that the incident

---

https://www.jud2.ct.gov/crdockets/CaseDetail.aspx?source=Pending&Key=04e6231f-59d0-4717-a810-2cf05e66922d (last visited Mar.11, 2021).

comprised a "single, solitary email to a scorned woman/tenant" and assails the complainant's account as false. ECF No. 1 at 10. According to Mr. Lawrence, the term "harass" means a repeated and persistent course of conduct, which is not an accurate description of either incident. ECF No. 1 at 9; ECF No. 17 at 2, 5, 27.

Mr. Lawrence further claims that Hearst's discussion of closed, prior incidents was defamatory because the incidents did not result in any arrests in that "police investigations never saw any probable cause for harassment let alone anything else." ECF No. 17 at 5. And, according to Mr. Lawrence, the defendant failed to clearly distinguish between arrests and convictions, ECF No. 17 at 6, leaving the reader to imagine he was convicted. ECF No. 41-11 at 36.

Finally, he claims that the statement that he harassed "women" is libelous because Hearst only names one woman - Wendy Higgins Chambers. He further states that she never complained to the store manager or filed a police report. ECF No. 17 at 34.

Hearst argues that Mr. Lawrence's defamation claims are not actionable because it relied on and accurately conveyed the contents of the arrest warrant and case incident report, official police documents. Its use of the terms "harass" and "harassment" to describe Mr. Lawrence's conduct was not defamatory, Hearst contends, because the terms fairly characterize his alleged conduct. In support, it points to the other incidents attributed to Mr. Lawrence in the arrest warrant application, upon which its reporter was entitled to rely. Hearst further argues that its reference to "women" is not defamatory, again pointing to the warrant application's discussion of ten prior incidents.

The Second Circuit recently set forth the standards for a defamation claim in addressing Mr. Lawrence's related case against Altice, the parent company of News 12: "To prevail on a defamation claim in Connecticut, a plaintiff must show that (1) the defendant published a

defamatory statement that (2) identified the plaintiff to a third person, (3) was published to a third

person, and (4) led to the plaintiff's reputation suffering injury." *Lawrence v. Altice USA*, ___ Fed.

App'x ___, 2021 WL 58317, at *1 (2d Cir. Jan. 7, 2021).  A statement is defamatory

> when it tends to harm the reputation of another as to lower him in the estimation of
> the community or to deter third persons from associating or dealing with him.  Of
> course, for a claim of defamation to be actionable, the statement must be false.
> While truth is an affirmative defense to defamation under the common law,  under
> the First Amendment, private-figure plaintiffs such as Lawrence. have the burden
> of proving falsity against media defendants. . . . .
> Media defendants do not incur liability for reporting that is substantially true even
> if that reporting does not satisfy a fussy insistence upon literal accuracy.  In
> determining substantial truth, the issue is whether the libel, as published, would
> have a different effect on the reader than the pleaded truth would have produced.
> A defendant's statement is substantially true when the main charge, or gist, of the
> libel or defamation is true and, consequently, minor errors that do not change a
> reader's perception of the statement do not make the statement actionable.
> Particular words or statements must be viewed, not in isolation, but in terms of the
> context of the entire communication

*Id.* (internal quotation marks, alterations, and citations omitted).

Hearst also invokes the "fair report privilege" (ECF No. 14-1 at 12), which provides that

"[e]ven when there is a defamatory statement, the publication of defamatory matter concerning

another in a report of an official action or proceeding or of a meeting open to the public that deals

with a matter of public concern is privileged if the report is accurate and complete or a fair

abridgement of the occurrence reported."  *Burton v. American Lawyer Media, Inc.*, 83 Conn. App.

134, 137-38 (2004).  "A report of the fact of [an] arrest and of the criminal charge made by a law

enforcement officer and of the contents of an arrest warrant or arrest report [is] within the fair

report privilege."  *Finnelli v. Tepfer*, No. CV075011659S, 2009 WL 1424688, at *6 (Conn. Super.

Ct. Apr. 24, 2009).  "If the report is accurate or a fair abridgement of the proceeding, an action

cannot constitutionally be maintained for defamation." *Burton*, 83 Conn. App. at 138; *see also id.*

at 140 ("It is not necessary that [the report] be exact in every immaterial detail or that it conform

to that precision demanded in technical or scientific reporting.  It is enough that it conveys to the persons who read it a substantially correct account of the proceedings.").[5]  "The accuracy required is to the proceedings, not to the objective truth of the defamatory charges." *Id.* at 140.  In other words, a defendant has no duty to investigate the accuracy of the police report or go behind the statements contained therein.  *See id.* at 141.

Especially because some of the facts overlap with this case, the Court finds instructive the Second Circuit's analysis in the similar case Mr. Lawrence brought against News 12 for its reports about his breach of peace arrest.[6]  *Lawrence v. Altice USA*, ___ Fed. App'x ___, 2021 WL 58317, at *1 (2d Cir. Jan. 7, 2021).

Mr. Lawrence alleged that News 12 defamed him when it referred to the conduct underlying his March 6, 2018 arrest for breach of peace as "stalking."  The district court granted summary judgment in favor of News 12's parent company, finding that its reports were substantially true and not defamatory. *Lawrence v. Altice USA*, No. 3:18CV1927(SRU), 2020 WL 108980, at *1 (D. Conn. Jan. 9, 2020).  On appeal, the Second Circuit determined that News 12's use of the term "stalking" to describe "what police said regarding Lawrence's documented history of following women in a harassing manner" was not defamatory. 2021 WL 58317, at *2.  Pointing to Merriam-Webster's Dictionary definition of "stalking," the Court of Appeals concluded that "[t]he totality of Lawrence's conduct - including on November 5th and numerous past instances -

---

[5] It is not clear whether there is any meaningful difference between the "substantial truth" required of media defendants in defamation cases generally – as discussed in the Second Circuit's opinion in *Altice* – and the "substantially correct account" required by the fair report privilege – as discussed in the Connecticut Appellate Court's opinion in *Burton*.  I nonetheless set forth both doctrines here for the sake of completeness, and find that the news articles challenged in this case satisfy the requirements of both.

[6] The Court afforded the parties the opportunity to file supplemental briefs regarding the Second Circuit's decision in *Altice*.  ECF No. 36.

met the common definition of 'stalking': 'to pursue quarry or prey stealthily,' or 'to pursue obsessively to the point of harassment.'" *Id.* The Court reasoned:

> As described in the arrest warrant application on which News 12 based its reporting, Lawrence was accused on November 5, 2017 of following a woman inside a grocery store and out to her car in the parking lot, where he stood staring at her. This behavior was similar to his behavior in ten other reported incidents since 2002 in which he followed women in public places causing them to call the police because they felt uncomfortable. Therefore, because the November 5th incident and the other incidents mentioned in the arrest warrant involved Lawrence's repeated, unsolicited, and frightening behavior toward women, they were fairly described as stalking.

*Id.* at *2.

As to Mr. Lawrence's argument that New 12's report was defamatory because he was charged with breach of peace and not stalking, the Court of Appeals explained that this inaccuracy was not defamatory because "[a] media defendant's characterization of criminal allegations against a private plaintiff is substantially true if the characterization comports with the common understanding of the terms employed." *Id.* (citing cases). The Court concluded that News 12's "use of the term 'stalking' would not have affected average readers' and viewers' perceptions of Lawrence because the gist of its reporting established that Lawrence's behavior met the common definition of stalking." *Id.* The Court went on to note that News 12's reports "covered not just the November 5th incident, but several instances of Lawrence's similar conduct spanning over a decade. The reports summarized what the police said regarding the November 5th incident, Lawrence's charges for similar behavior in California (where he was actually charged with stalking), and his outstanding protective order." *Id.* The Court also observed that News 12's "reports included segments mentioning multiple 'women' and nearly all used the phrase 'several women,' though only one woman was involved in the November 5th incident." *Id.* The Court concluded that "the 'main charge, or gist' of News 12's reports was that Lawrence's behavior in the

November 5th incident was consistent with his history of similar behavior, thus fairly summarizing what the police stated in the arrest warrant affidavit" and that "when viewed in context and from the vantage point of the average audience member, News 12's reporting on the information it obtained from the police about Lawrence was 'substantially true' and not defamatory." *Id.* at *3 (internal citation omitted).

Mr. Lawrence maintains that the Second Circuit erred and was "flat out wrong" in its conclusion in *Altice*. ECF No. 41 at 3.  As to this case, he argues that Hearst's use of the term "harass" was defamatory because the breach of peace statute does not contain the word harass, the warrant did not use the word "harassment" when describing his "arresting behavior," and even Ms. Chambers did not use the word harass in describing her encounter.  ECF No. 41 at 4, 35-36.  He posits that "harassment" is a "loaded term" with "even worse connotations than stalking."  ECF No. 41 at 2, 19.

Guided by the Second Circuit's analysis and conclusion in *Altice* that use of the term "stalk" to describe Mr. Lawrence's conduct was not defamatory, I find that Mr. Lawrence's claim that Hearst's use of the term "harass" was defamatory similarly fails.  Mr. Lawrence's alleged conduct in 10 prior incidents as set forth in the warrant application meets the common definition of harass: "to annoy persistently"; "to create an unpleasant or hostile situation for especially by uninvited and unwelcome verbal or physical conduct."  *Harass*, Merriam-Webster's Online Dictionary (accessed March 11, 2021).[7]

---

[7] It bears mentioning that the Second Circuit used the term "harass" in describing his behavior. *Lawrence v. Altice USA*, 2021 WL 58317, at *2 ("News 12 accurately reported on what police said regarding Lawrence's documented history of following women around in a harassing manner.").

Mr. Lawrence also argues that Hearst defamed him by "mention[ing] past incidents (that were fully investigated and never resulted in any arrests and that are cases known to be long closed)" where "[t]hese past incidents can only be legally viewed as incidents devoid of any criminal intent and probable cause worthy of an arrest." ECF No. 17 at 25. This too was not defamatory. Hearst's discussion of these past incidents came straight from the arrest warrant application.[8] Moreover, to the extent that Mr. Lawrence suggests that Hearst falsely conveyed that he had been charged with or convicted of crimes in relation to these incidents, all of which apparently occurred in Westport, that is not so. Article 2 expressly states "A criminal history search of Lawrence turned up no criminal history in Connecticut, but revealed Lawrence's arrests in Florida and California." ECF No. 14-4 at 4. Article 3 states "Lawrence has a record of arrests outside of Connecticut, including resisting arrest and fleeing/eluding police in Florida. In

---

[8] Mr. Lawrence emphasizes that he lived in California 2007 - 2016, ECF No. 1 at 1, and asks, in light of this, how Hearst's statement that he harassed women for years could be truthful. However, the arrest warrant application stated that "in checking [the Westport Police] department['s] case history with Lawrence, [Officer Sullivan] learned that there were 10 case incidents logged from 2002 till present," that "[i]n all of these complaints Lawrence was seen following the complainants around a store or coffee shop and then following them out to their cars where he would either stare at them or get right into their personal space," that "[i]n most of these cases, Lawrence was told that his actions scared the complainants to the point of them calling the police," and that "there were a lot of other incidents with Lawrence that were not reported to the police." ECF No. 14-2 at 3-4. Hearst was entitled to rely on the statements in the arrest warrant application, an official document, and was not required to independently investigate their accuracy. *Burton,* 83 Conn. App. at 141. In his supplemental brief, Mr. Lawrence submits evidence, including the deposition of Officer Sullivan, who authored the breach of peace arrest warrant, and argues that the deposition "confirm[s] that harassment and/or threatening was never part" of the prior incidents. ECF No. 41 at 4. He also offers the dispatch tapes of the call made by the Fresh Market complainant to the Westport police in support of his argument that she did not use the word "harass" in her report to the police. ECF No. 41 at 3. In so doing, that is, in going behind the statements in the warrant, the plaintiff misapprehends the relevant legal principles undergirding his defamation claims against the media. *See Burton*, 83 Conn. App. at 141.

California, he was charged with petty theft, theft of personal property, stalking, inflicting corporal injury to spouse and battery of a spouse." ECF No. 14-6.

Mr. Lawrence's related claim that Hearst defamed him by stating that he had harassed "women for years" also fails. Without citing any legal authority, he contends that articles about harassment demand actual names and actual descriptions of the type of harassment from actual women." ECF No. 41-1 at 3 . As the Court of Appeals observed, in addition to the November 5th incident, the arrest warrant application stated that there had been several instances of similar conduct by Mr. Lawrence spanning over a decade, that he had been charged with stalking in California, and that he had an outstanding protective order. Thus, the defendant's use of the term "women" was substantially true. Additional details beyond what was set forth in the warrant application were not required. Whether Mr. Lawrence actually committed the incidents attributed to him, or the details of his conduct, is immaterial because the relevant inquiry is solely whether the media reports fairly described the official documents prepared by the police. Here, the Articles captured the "gist" of the warrant's contents. *See Mercer v. Cosley*, 110 Conn. App. 283, 304 (2008) ("[i]t is not necessary for the defendant to prove the truth of every word of the libel. If he succeeds in proving that the main charge, or gist, of the libel is true, he need not justify statements or comments which do not add to the sting of the charge or introduce any matter by itself actionable.")

Mr. Lawrence also argues that Hearst libeled him in Article 2 with its headline "Local women haunted for years by a man they say would aggressively approach them at local stores and cafes are speaking out after his arrest earlier this month." ECF No. 1 at 5. He contends that the statement is false because he "lived in California from 2006 - 2017;" only one woman, Wendy

16

Higgins Chambers, "spoke out;"[9] and the term "haunt" is "libelous" because there was "NO habitually recurring frequent persistent behavior with a particular complainant," which he contends is a requirement of various dictionary definitions of "haunt." ECF No. 1 at 5; ECF No. 17 at 13, 32, 34.

Hearst's use of the term "women" was not libelous. The contents of Article 2 clarified that Ms. Chambers was the individual "speaking out" and that according to her, at least one other woman had had an encounter with Mr. Lawrence. The article also noted that the Westport police had notice of ten other incidents involving Mr. Lawrence. *See Woodcock v. Journal Publishing Co.*, 230 Conn. 525, 554 (1994) ("Inaccurate headlines are not libelous if they are correctly clarified by the text of an article.") (Berdon, J., concurring) (citing *Contemporary Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 624–25 (2d Cir. 1988)). As to Hearst's use of the term "haunt," it was not defamatory because it fairly characterized the impact of Mr. Lawrence's conduct on Ms. Chambers, at least, that is "to have a disquieting or harmful effect on: TROUBLE." *Haunt*, Merriam-Webster Online Dictionary (accessed March 11, 2021). In any event, "[f]acts do not cease to be facts because they are mixed with the fair and expectant comment of the story teller, who adds to the recital a little touch by his piquant pen." *Strada v. Connecticut Newspapers, Inc.*, 193 Conn. 313, 317 (1984) (internal quotation marks and citations omitted). "Embellishments upon the information obtained from the primary sources . . . can be attributed to the leeway

---

[9] Mr. Lawrence argues that the term "women" was false because the reporter did not name any complainant other than Wendy Higgins Chambers. As to Ms. Chambers, Mr. Lawrence argues she "never complained to police when we met (to which I have all the facts about to which reporter never had the decency to ask me) and Wendy Higgins Chambers never complained to market manager or even me for she had my business card." ECF No. 17 at 34.

afforded an author who attempts to recount and popularize an . . . event." *Id.* at 320 (internal quotation marks omitted).

According to the plaintiff, "the complex issues of how stalking and harassment are consistently treated within law and language . . . demands a jury. . . . " ECF No. 41 at 2. But the Court has carefully considered the large volume of evidentiary and other material filed by the plaintiff and does not find anything in that material that raises a genuine dispute about a material fact, i.e., a fact that would make a difference in the outcome under the governing law. That is so because Hearst has demonstrated that its reports were "substantially true" and "fair abridgements" of official police documents. Accordingly, Hearst is entitled to summary judgment as to the plaintiff's defamation claims.

### B.      Emotional Distress

Mr. Lawrence also asserts a claim of emotional distress. ECF No. 1 at 22. This claim fails for the same reasons cited by the Second Circuit in *Altice*.

To prevail in an action for intentional infliction of emotional distress, the plaintiff must show: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *DeLaurentis v. City of New Haven*, 220 Conn. 225, 266-67 (1991). Conduct is "extreme and outrageous" when "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *DeLeon v. Little*, 981 F. Supp. 728, 737 (D. Conn. 1997). Here, as in *Altice*, the defendant's substantially true reports concerning Mr. Lawrence's conduct cannot be so characterized. *See id.*

("Whether conduct is extreme and outrageous is a determination for th[e] court to make in the first instance.").

## IV.   CONCLUSION

For these reasons, the defendants' motion for summary judgment (ECF No. 14) is granted.[10] The Clerk of the Court is directed to enter judgment and close the case.

IT IS SO ORDERED.

_____/s/_____

Michael P. Shea, U.S.D.J.

Dated:       Hartford, Connecticut
             March 11, 2021

---

[10] In addition to dismissal under Rule 12(b)(6), Hearst sought dismissal pursuant to Connecticut's anti-SLAPP (Strategic Lawsuit Against Public Participation) statute, Conn. Gen. Stat. § 52-196a. ECF No. 14-2.  However, because, in adjudicating Hearst's Rule 12(b)(6) motion, I converted it to a motion for summary judgment under Rule 12(d), and because I have now granted Hearst's converted motion and dismissed the case, I do not consider dismissal of Mr. Lawrence's claims on the alternate basis of Connecticut's anti-SLAPP statute. *See Khan v. Yale Univ.,* No. 3:19CV1966(KAD), 2021 WL 66458, at *3 n.4 (D. Conn. Jan. 7, 2021) (declining to reach the special motion to dismiss under Conn. Gen. Stat. § 52-196a where the Court granted dismissal under Fed. R. Civ. P. 12(b)(6)); *Zuro v. Town of Darien*, 432 F. Supp. 3d 116, 130 (D. Conn. 2020) (same).